AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Josephus Eggelletion, Joel Williams,<br>Sidney Cambridge and Ronald Owens<br>*Defendant* | ) ) ) ) ) Case No. 09-6357-SNOW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __see below__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant violated __18__ U. S. C. § __1956(h)__, an offense described as follows:

From in or about March 23, 2006, to on or about September 2, 2009, at Broward County, in the Southern District of Florida, and elsewhere, defendants JOSEPHUS ("Joe") EGGELLETION, RONALD("Ron") OWENS, SIDNEY CAMBRIDGE and JOEL ("Jodie") WILLIAMS, did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with each other and with other persons known and unknown to the Grand Jury to conduct financial transactions involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, to wit, mail and/or wire fraud funds obtained from a purported investment fraud scheme, with the intent to conceal and disguise the nature. location, source, ownership and control of said property, in violation of Title 18, United States Code, Section 1956(a)(3)(B), all in violation of Title 18, United States Code, Section 1956(h).

This criminal complaint is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

*Complainant's signature*

BRIAN J. SZCZEPANSKI SPECIAL AGENT
Brian J. Szczepanski
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/22/09

*Judge's signature*

City and state: Ft. Lauderdale, FL   Lurana S. Snow, U.S. Mag. Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Brian J. Szczepanski being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the Miami, Florida Field Division. I have been a Special Agent with FBI for approximately eight years and have been assigned to the Miami Division for all eight years, during which time I have specialized in investigations involving money laundering, public corruption, and mail and wire fraud. I have been personally involved in investigations concerning money laundering. The following information is known to your affiant personally, or was reported to your affiant by witnesses with personal knowledge of the criminal acts.

2. Beginning in or about April 2005, the Miami Division of the Federal Bureau of Investigation (hereinafter referred to as the "FBI") initiated an investigation into public corruption in South Florida. During the course of the undercover operation, the FBI utilized three (3) FBI agents acting in an undercover capacity. Two of the undercover FBI agents posed as asset managers, who, along with a cooperating witness, among other services, purportedly represented individuals seeking to protect and or hide assets. The third undercover FBI agent posed as the "boss" or employer of the asset managers.

3. In or about February 27, 2006, the undercover agents were introduced to defendant JOSEPHUS ("Joe") EGGELLETION, who, at that time served as a member of the Broward County Commission as well as vice-mayor of Broward County. The introduction was made by F.S., a local area politician.

4. On or about March 23, 2006, an undercover agent made a donation check of $5000 to G.O.L.F. ("Golf Oriented Leadership Foundation"), a purported charitable organization that

1

was run by defendant EGGELLETION.

5. On or about May 30, 2006, defendant EGGELLETION stated to an undercover agent and a cooperating witness, "If you wanna do some deals in the Bahamas let me know. Yes sir. In fact I'm gonna be raising some money for the prime minister of the Bahamas that's running for re-election."

## THE MONEY LAUNDERING SCHEME

6. On or about July 31, 2006, after the undercover agents had indicated they were interested in opening off-shore bank accounts on behalf of a client, defendant EGGELLETION agreed to provide contacts with bankers in the Bahamas, stating that, in the Bahamas, he does not have to adhere to the ethical restrictions he has in the United States.

7. On or about October 2, 2006, defendant EGGELLETION again offered to set up meetings with contacts in the Bahamas.

8. On or about November 15, 2006, defendant EGGELLETION told A.I., a hotelier with connections in the Bahamas, that an undercover agent and a cooperating witness needed help setting up a Bahamian company and bank account for their client.

9. On or about December 6, 2006, defendant EGGELLETION told the an undercover agent and a cooperating witness that, if A.I. didn't come through in the next few days, they should call "my man," E.D., who has "very good connections in the Bahamas." Defendant EGGELLETION acknowledged that he (EGGELLETION) would be compensated for his help.

10. On or about December 15, 2006, defendant EGGELLETION was informed by an

undercover agent and a cooperating witness that they were seeking to hide their client's proceeds from a non-existent European high yield investment fraud scheme that was sending out "made up" statements to clients. Defendant EGGELLETION stated he would not introduce them to someone that would harm them.

11. On or about January 31, 2007, defendant EGGELLETION advised an undercover agent that "those guys," referring to A.I. and K.G., did not want to do anything, as they were "frightened" and "skeptical." Defendant EGGELLETION advised he would just go to other sources.

12. On or about February 9, 2007, defendant EGGELLETION told an undercover agent it would be better to take a trip to the Bahamas and "...don't give em...don't give folk a whole lot of...the less they know the better off you may be," referring to their reason for setting up the Bahamian bank account.

13. On or about February 14, 2007, defendant EGGELLETION introduced an undercover agent and a cooperating witness to defendant JOEL WILLIAMS for the purpose of assisting the undercover agent and cooperating witness in opening a bank account in the Bahamas.

14. On or about February 24, 2007, defendant EGGELLETION introduced undercover agents to defendant RONALD OWENS, who was to work with defendant WILLIAMS regarding the undercover agents' banking needs in the Bahamas.

15. On or about March 6, 2007, at Nassau, Bahamas, defendants WILLIAMS and OWENS met with an undercover agent and a cooperating witness who told the defendants that they had a client who ran an investment club who was going to "get caught" and "sooner or later

he will get screwed." They further advised the defendants that they planned to hide their client's income by putting his money in an account in the Bahamas and then moving the money to another account on another island.

16. In the same conversation, on or about March 6, 2007, at Nassau, Bahamas, defendant WILLIAMS said to an undercover agent and a cooperating witness that, in the Bahamas, they did not call it laundering money, as long as the money did not come from arms, drugs, or terrorists.

17. In the same conversation, on or about March 6, 2007, at Nassau, Bahamas, defendant OWENS told an undercover agent and a cooperating witness that, based on EGGELLETION's instructions, whatever defendant EGGELLETION's "points" were, that money that would have to come to him and defendant WILLIAMS first to prevent a trail that would show in the United States.

18. Later, on or about March 6, 2007, at Nassau, Bahamas, defendants OWENS and WILLIAMS, along with an undercover agent and a cooperating witness, met with defendant SIDNEY CAMBRIDGE. At that time the defendants agreed that, for every deposit that came into the bank, defendants OWENS, WILLIAMS, CAMBRIDGE and EGGELLETION would receive a percentage of the money laundered.

19. Also, on or about March 6, 2007, defendant CAMBRIDGE provided an undercover agent with an application for opening an International Business Corporation (hereinafter "IBC") and wiring instructions to CAMBRIDGE's trust account at First Caribbean International Bank (hereinafter "FCIB") in Nassau, Bahamas.

20. On or about March 23, 2007, defendant CAMBRIDGE received a $100,000 wire

4

transfer into his trust account at FCIB in Nassau, Bahamas, purportedly from undercover agents, from a bank account in Miami, Florida.

21. On or about March 24, 2007, defendants OWENS and WILLIAMS met with undercover agents and a cooperating witness and agreed that defendant EGGELLETION would be paid a cash fee of two percent of the total amount laundered for his role in the money laundering operation.

22. On or about March 28, 2007, at Nassau, Bahamas, defendant CAMBRIDGE took an undercover agent to the office of S. B., a banker with FCIB, to be interviewed and sign documents opening a bank account, at FCIB, in the name of Hexagon Development.

23. On or about March 30, 2007, defendant OWENS instructed an undercover agent that, per defendant EGGELLETION, any "package" for EGGELLETION had to come to OWENS first.

24. On or about March 30, 2007, defendant OWENS received $7000 in cash from an undercover agent, which also included the payments for defendants WILLIAMS, CAMBRIDGE and EGGELLETION.

25. On or about April 4 and 13, 2007, defendant CAMBRIDGE transferred a total of $97,000 from his bank account at FCIB to the Hexagon Development account at FCIB.

26. On or about May 21, 2007, the Hexagon Development bank account at FCIB, in Nassau, Bahamas, that defendant CAMBRIDGE assisted an undercover agent in opening, received a $200,000 wire transfer from a bank account in Miami, Florida, purportedly from the undercover agents.

27. On or about June 6, 2007, defendant CAMBRIDGE caused a wire transfer of

$199,000 to be made from the Hexagon Development bank account at FCIB, in Nassau, Bahamas, to a bank account in St. Croix.

28. On or about June 6, 2007, defendants WILLIAMS and OWENS received $14,000 in cash from an undercover agent, representing seven percent of the $200,000 purported money laundering transaction. At that time, OWENS stated that "the third party" (eg., defendant EGGELLETION) was splitting $10,000 with him and defendant WILLIAMS, and that the remaining $4,000 was to be paid to defendant CAMBRIDGE.

29. On or about June 8, 2007, defendant OWENS advised an undercover agent that he put defendant EGGELLETION's share of the $200,000 purported money laundering transaction fees in EGGELLETION's golf bag while the two were playing golf that morning.

30. On or about August 30, 2007, defendant CAMBRIDGE received a $200,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida, purportedly from undercover agents.

31. On or about September 5, 2007, defendant CAMBRIDGE transferred approximately $200,000 from his trust account at FCIB in Nassau, Bahamasm, to the Hexagon Development account at FCIB.

32. On or about September 12, 2007, defendant OWENS instructed an undercover agent to put his and defendant EGGELLETION's portion of the $14,000 cash fee for their $200,000 purported money laundering transaction into two envelopes, one for him and one for defendant EGGELLETION.

34. On or about September 12, 2007, defendant OWENS received a white envelope containing $3,300 cash, representing OWENS' portion of the money laundering fee. He also

6

received a black leather passport holder containing $3,300 cash, which represented defendant EGGELLETION's share of the money laundering fee.

35. Also, on or about September 12, 2007, defendants OWENS attempted to give defendant EGGELLETION the black leather passport holder with $3,300 cash inside but was told by EGGELLETION that he wanted to do that at another location. Defendant OWENS later told an undercover agent that he (EGGELLETION) was just being cautious because of recent arrests.

36. On or about September 13, 2007, at Miami, Florida, defendant WILLIAMS received $3,400 cash, which was his portion of the money laundering fee and $4,000 in cash, which was to be paid to defendant CAMBRIDGE in the Bahamas.

37. On or about November 15, 2007, defendant CAMBRIDGE received a $200,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida, purportedly from undercover agents.

38. On or about November 23, 2007, defendant CAMBRIDGE received a $200,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida., purportedly from undercover agents.

39. On or about November 23, 2007, defendants OWENS and WILLIAMS traveled to the Bahamas with undercover agents to meet with defendant CAMBRIDGE and discuss setting up additional IBCs and bank accounts for the money laundering scheme.

40. On or about November 23, 2007, at Nassau, Bahamas, defendant CAMBRIDGE was told by an undercover agent that the funds came from a "Ponzi" scheme. After acknowledging his understanding of the purported source of the funds, defendant CAMBRIDGE instructed

undercover agents how to launder the proceeds in the Bahamas.

41. On or about November 23, 2007, at Nassau, Bahamas, defendant CAMBRIDGE stated to undercover agents that he had only received $2,000, not $10,000, from defendant WILLIAMS for his laundering of their funds.

42. On or about November 23, 2007, at Nassau, Bahamas, defendant CAMBRIDGE provided a $399,000 check to undercover agents for deposit into the Hexagon bank account at FCIB.

43. On or about November 26, 2007, defendant OWENS assured an undercover agent that, "Every time I got money, Joe (EGGELLETION) has got the same money. I can guarantee you that."

44. On or about November 28, 2007, at Fort Lauderdale, Florida, defendant OWENS received $5000 cash from an undercover agent as his fee for the November 15, 2007 purported money laundering transaction which involved $200,000.

45. On or about November 28, 2007, at Fort Lauderdale, Florida, defendant EGGELLETION received a day planner which contained $5000 cash from an undercover agent as his fee for the November 15, 2007 money laundering transaction.

46. On or about November 29, 2007, defendant WILLIAMS told defendant OWENS that it was none of the business of the undercover agents how he (WILLIAMS) divided the money he received for laundering money with defendant CAMBRIDGE.

47. On or about November 29, 2007, defendant EGGELLETION delivered a letter, along with $5000 cash, to defendant OWENS stating he was "shocked" to find money inside the organizer given to him by an undercover agent and since it is illegal he is returning it, but he may

8

need a loan in the future.

48. On or about December 12, 2007, defendant EGGELLETION told an undercover agent he understood defendant WILLIAMS had "screwed up" and that he (EGGELLETION) had given defendant OWENS the "calendar" he received from the undercover agent on November 28, 2007.

49. Also, on or about December 12, 2007, defendant OWENS received $2,500 cash and a leather day planner containing an additional $2,500 cash for defendant EGGELLETION from undercover agents, which constituted their five percent fee for $100,000 of the $200,000 that was sent through the FCIB account in the name of Hexagon Development in Nassau, Bahamas on November 23, 2007.

50. Also, on or about December 12, 2007, defendant EGGELLETION told defendant OWENS that he wanted to "check out" the undercover agents, in that he had to be careful because people want to catch him in criminal activity.

51. On or about December 13, 2007, defendant OWENS explained, to an undercover agent, that defendant EGGELLETION did receive the payment on November 28, 2007, and only claimed that he gave him (OWENS) back the money because he was very nervous about being caught by law enforcement.

52. On or about December 17, 2007, defendant OWENS told an undercover agent that defendant EGGELLETION wanted him to hold onto his fee for $100,000 of the $200,000 November 23, 2007 money laundering transaction.

53. On or about December 18, 2007, at Fort Lauderdale, Florida, defendant OWENS received $2,500 cash and a leather portfolio folder also containing $2,500 cash from undercover

agents, which represented defendant OWENS' and defendant EGGELLETION's fees for the remaining $100,000 of the November 23, 2007 money laundering transaction.

54. On or about December 18, 2007, defendant OWENS stated, to an undercover agent, that defendant EGGELLETION instructed him to hold onto his (EGGELLETION'S) $2500 payment for the November 23, 2007, money laundering transaction. Defendant OWENS further advised that he, OWENS, was now holding $5000 for defendant EGGELLETION.

55. On or about December 19, 2007, defendant OWENS stated, to an undercover agent, that he didn't want to be defendant EGGELLETION 's "bagman" and, therefore, he was thinking of opening a bank account in his company's name and giving EGGELLETION a cash card with his own pin number.

56. On or about January 30, 2008, defendant OWENS, at Sunny Isles, Florida, met with undercover agents and received $25,000 cash which represented his and defendant EGGELLETION 's fees for a purported $500,000 money laundering transaction.

57. On or about January 30, 2008, defendant WILLIAMS met with RONALD OWENS, and accepted $2000 cash, purportedly paid by the undercover agents so that WILLIAMS would not go to the police. Defendant WILLIAMS assured defendant OWENS that he would not go to the police.

58. On or about February 8, 2008, defendant EGGELLETION met with OWENS, after OWENS said that he was now holding $15,000 for him and advised that there would be another $5000 next week..

59. On or about February 15, 2008,defendant EGGELLETION told defendant OWENS to just put the $15,000 he was holding for him away, since he would need it to take care of his

10

attorney.

60. On or about the morning of February 22, 2008, defendant EGGELLETION met with OWENS and, after being told that the undercover agents could be charged with money laundering "ponzi scheme money," claimed he did not know what they were doing, thought it was just an investment fund they were putting over there and said it should be checked out if it is illegal.

61. On or about the afternoon of February 22, 2008, at Hollywood, Florida, defendant EGGELLETION met with OWENS and took possession of a black leather day planner containing $15,000 cash, which represented defendant EGGELLETION'S share of proceeds from purported money laundering transactions.

62. Also, on or about the afternoon of February 22, 2008, defendant EGGELLETION told OWENS that if the undercover agents talk about the money he should tell them that "I don't wanna know about that" and he would prepare consulting agreements about what they did in the Bahamas so they would be "legit, straight up."

FURTHER AFFIANT SAYETH NAUGHT

_____
SPECIAL AGENT BRIAN J. SZCZEPANSKI
FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed to before me
this 23rd day of September, 2009

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

11